DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Dennis Ray Lowe, appeals the decision of the Summit County Court of Common Pleas, which convicted him of aggravated murder and attempted aggravated murder and sentenced him accordingly. This Court affirms.
 I. {¶ 2} Shortly after midnight on August 24, 2002, shootings occurred at the location of Russell Products in Akron. The shootings resulted in injuries to two victims, Nelson Perry ("Nelson") and April Brown ("April"). Around three hours after the shootings took place, April died from her injuries at Akron City Hospital. On September 17, 2002, appellant turned himself into the police and was arrested in connection with the shootings. He was charged with aggravated murder and attempted aggravated murder, both with firearm specifications. Appellant pled not guilty to the charges and voluntarily waived his right to a jury trial. On December 16, 2002, a bench trial commenced and the trial court found appellant guilty on both counts. The court sentenced him to life imprisonment for the aggravated murder, ten years imprisonment for the attempted aggravated murder, and three years imprisonment for one of the gun specifications. The court ordered that appellant serve the sentences consecutively to each other.
 {¶ 3} Appellant timely appealed his convictions and sentencing, setting forth three assignments of error for review.
 II. FIRST ASSIGNMENT OF ERROR
"There was insufficient evidence as a matter of law of prior calculation and design to sustain the convictions for aggravated murder and attempted aggravated murder."
 SECOND ASSIGNMENT OF ERROR
"Appellant's convictions were against the manifest weight of the evidence."
 {¶ 4} In his first and second assignments of error, appellant challenges the adequacy of the evidence produced at his trial. Specifically, appellant argues that his convictions for aggravated murder and attempted aggravated murder were based on insufficient evidence and against the manifest weight of the evidence. An evaluation of the weight of the evidence, however, is dispositive of both issues in this case. Appellant's first two assignments of error lack merit.
 {¶ 5} As a preliminary matter, this Court notes that sufficiency of the evidence produced by the State and weight of the evidence adduced at trial are legally distinct issues. State v. Thompkins (1997),78 Ohio St.3d 380, 386.
 {¶ 6} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, citingThompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 7} This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
"Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis omitted.) State v.Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462.
 {¶ 8} In this case, appellant was convicted of aggravated murder, in violation of R.C. 2903.01(A), which provides in pertinent part: "(A) No person shall purposely, and with prior calculation and design, cause the death of another[.]" Appellant was also convicted of attempted aggravated murder and two gun specifications.
 {¶ 9} The State presented numerous witnesses at trial. Nelson, the surviving victim, testified that he and April, the deceased victim, were good friends. He stated that, on the night of the incident, April came to visit him. April arrived with her friend Joyvita Wright ("Ms. Wright"), who was appellant's girlfriend. Nelson testified that April told him appellant owed her something and she was going to go pick it up from him that night. Although Ms. Wright did not want him to come along, Nelson joined April to go find appellant. Nelson testified that Ms. Wright stopped at a pay phone at the Wooster Market and called appellant before she drove April and Nelson to the house to see him.
 {¶ 10} Nelson stated that, once they arrived at the house, April and appellant started talking and he overheard their conversation. He testified that appellant owed April for some drugs that he had taken when he broke into a Garry Dumire's house ("Mr. Dumire"), where April also resided off and on. After he and April stopped talking, appellant told Nelson they were going to go collect some of the items he had stolen from Mr. Dumire's home.
 {¶ 11} Nelson testified that he and April got into appellant's brown Ford pick-up truck and appellant drove them to the parking lot of Russell Products, a business located on Forge Street in Akron. Appellant parked the truck and they all got out at the same time. Nelson testified that appellant walked to the front of his truck on the driver's side and he followed him on the passenger's side. He stated that appellant proceeded to shoot him one time and then shot April multiple times. Nelson stated that appellant discharged his gun until it was empty and then got into his pick-up truck and sped away. Nelson then got up and checked on April, who was lying there shaking with multiple gunshot wounds. He testified he could not carry April due to his injuries, but he was able to go to nearby Akron City Hospital for assistance for himself and April.
 {¶ 12} Deborah Hyatt ("Ms. Hyatt"), who was at her mother's house on Forge Street the night of the incident, also testified at trial. She stated that sometime after midnight she heard between four and six gunshots coming from down the street in the direction of Russell Products. Ms. Hyatt continued to listen from her open window and she heard a woman moaning. She testified that the woman's moaning sounded like it was getting closer to the house. Ms. Hyatt heard the woman struggling to talk and she faintly heard a man's voice. She testified she then heard vehicles speeding up Forge Street and she called 911. Ms. Hyatt's recorded 911 call was played at trial.
 {¶ 13} Jack Marsh ("Mr. Marsh"), who lives near Russell Products on the corner of Forge Street and Adams Street, also testified at trial. Mr. Marsh stated that, on the night of the incident, he was awoken by loud voices that sounded as if they were outside his house. As he went downstairs, he heard gunshots and he went outside onto his sidewalk with his telephone in hand Shortly thereafter, he observed a pick-up truck speeding up Forge Street from the direction of Russell Products. Mr. Marsh testified that the truck came toward him and almost hit him as it turned right onto Adams Street. The State showed him three photographs of appellant's truck and Mr. Marsh identified them as photographs of the truck he observed that night.
 {¶ 14} Mr. Marsh testified that, a few minutes after the truck sped away, a male came running up the street from the direction of Russell Products. He asked him what was wrong and the male said he was shot and told Mr. Marsh to call 911. Mr. Marsh testified that the male had blood all over him and looked like he had been shot in the face. He stated the male kept running toward the hospital and Mr. Marsh called 911. His recorded 911 call was played at trial. Mr. Marsh stated he was still outside when a police car pulled up to him and he told the officer an injured male ran to the hospital, but there was a girl down the road. He testified the police took him down to the crime scene that same night and he gave his statement to the captain.
 {¶ 15} Richard Wendleken ("Mr. Wendleken"), a fireman and paramedic for the City of Akron, testified that, on the night of the incident, he and his partner were dispatched to a shooting in the area of Forge Street and Adams Street. They arrived at the area and drove around looking for a victim. They followed a police vehicle down Forge Street and they saw a body in the parking lot of Russell Products. Mr. Wendleken testified that they radioed for help, exited the ambulance and approached a white female victim. He stated she was lying face up, head towards the street, feet toward the building, not moving at all. She had blood all over her head and neck area, and bullet holes in both her upper right side and left side of her neck. Mr. Wendleken testified the victim had so much blood in her hair that he could not determine if she had been shot in the head and she was barely breathing. They moved her into the ambulance, gave her oxygen and an IV, and transported her to Akron City Hospital. Mr. Wendleken testified at trial that the female victim was April Brown.
 {¶ 16} Scott Nairn ("Mr. Nairn"), an Akron City Hospital security guard, testified that he was on duty the night of the incident. He stated he was in the parking lot when a fellow employee informed him there was a male yelling from the parking lot across the street. Mr. Nairn then observed a male coming toward him, bleeding and yelling for help. He grabbed a wheelchair, met the male, and helped him get into the emergency room. Mr. Nairn testified the male told him he had been shot at Russell Products, and there was a female still there who had been shot and needed help.
 {¶ 17} John Zografakis ("Dr. Zografakis") testified that he was the chief surgical resident working at Akron City Hospital on the night of the incident. He stated that he treated both gunshot victims in the emergency room and he identified them to be Nelson Perry and April Brown at trial. Dr. Zografakis testified that he treated Nelson for his injuries, specifically a gunshot wound to his nose area. He explained that the bullet had entered through the right side of Nelson's nose, traveled straight back and broke his first cervical vertebral body, bounced back and dropped down to rest in the tissues of the left side of Nelson's neck. He testified the bullet could not be removed at that time. After running several tests, Dr. Zografakis sent Nelson to the intensive care unit for critical care monitoring.
 {¶ 18} Dr. Zografakis then testified as to his treatment of April. He stated she was struggling to breathe when she arrived and they had to put a breathing tube in through her trachea. Dr. Zografakis observed several gunshot wounds to April's right armpit area and to the left side of her neck. He testified that she still did not have equal breath sounds, so they placed a second breathing tube into her right chest. He stated they gave April a blood transfusion because she had lost so much blood. April was not responding to any voice commands or touch commands, and she never opened her eyes when he asked her to do so. Dr. Zografakis testified April had substantial swelling in her right eye, which led him to conduct a CAT scan on her. The results of the scan revealed the gunshot wound to April's head that had completely penetrated her brain and rendered her injuries non-treatable. He stated April died from the gunshot wounds at 3:45am that morning. Dr. Zografakis stated that after he pronounced April dead, he informed the police of her death and notified the coroner's office of the same.
 {¶ 19} Lisa Kohler ("Ms. Kohler"), chief medical examiner for Summit County, testified that she performed an autopsy on the body of April Brown to determine the cause and manner of her death. She stated that she observed five different gunshot wounds on various parts of April's body. Ms. Kohler described in detail the location and appearance of all five gunshot wounds. She explained she found stippling on certain parts of April's body, which evidenced both that some of her wounds were close-range and that April made defensive movements during the shootings. Ms. Kohler identified four separate bullets or bullet fragments she had retrieved from April's body. She then testified that, in her expert opinion, April's cause of death was a gunshot wound to the head which herniated her brain and the manner of death was ruled as homicide.
 {¶ 20} Michael Roberts ("Mr. Roberts"), an employee in the firearm section of the Bureau of Criminal Identification and Investigation ("BCI"), provided his expert testimony at trial. Mr. Roberts stated he had analyzed several bullets and fragments that were removed from April's body, Nelson's body, and retrieved from the crime scene. He stated, in his expert opinion, that all four bullets were consistent with being fired from the same weapon or brand of weapon. He testified that he was able to determine, from four of the bullets, that the caliber of the gun used to shoot them was consistent with being a .357 Magnum. Mr. Roberts also testified that the absence of any cartridge cases or shells at the crime scene supports the ballistic evidence that a revolver-type gun, most likely a .357 Magnum, was used to shoot the victims.
 {¶ 21} Detective William Bosak ("Detective Bosak") of the Akron Police Department also testified at trial. He stated he was assigned to investigate the shootings. Detective Bosak interviewed several people and conducted multiple interviews with Nelson. He testified he first interviewed Nelson in the emergency room, where Nelson told Detective Bosak a guy named Dennis shot him and Dennis worked at Russell Products and lived on Victory Street. The next day, Detective Bosak stated he and Detective Richard Morrison ("Detective Morrison") presented a photo array to Nelson while he was recovering in the hospital. He testified that Nelson pointed to appellant's picture in the photo array and identified him as the shooter. Detective Bosak interviewed Nelson a few days later and Nelson gave him a full statement of the incident, again identifying appellant as the shooter. Detective Bosak's testimony corroborated Nelson's testimony at trial.
 {¶ 22} Detective Morrison testified he was also assigned to investigate the shootings and subsequent homicide. He stated the suspect was determined to be appellant and he had a description of the vehicle that fled the scene — a brownish pick-up truck. Detective Morrison interviewed appellant's parents, searched their basement, and found personal papers and ammunition belonging to appellant. He stated he found an advertisement appellant made for the sale or trade of a .357 Magnum, Smith Wesson, in order to obtain other various types of guns. Detective Morrison testified that he also discovered the brown pick-up truck at appellant's Victory Street residence, ran the license plate number, and learned that appellant had recently transferred the title into his girlfriend, Ms. Wright's name. He stated he also obtained two registrations and a contract of sale showing appellant as the owner of the truck. Detective Morrison testified he attained search and arrest warrants and searched appellant's house. He stated the police towed the truck and he interviewed Ms. Wright, but could not find appellant. He explained that the police later received tips that appellant had left town and he eventually received a letter in the mail at the station from appellant. Detective Morrison testified that appellant turned himself in to the police on September 17, 2002. He identified appellant at trial as the man Nelson had identified to him as his shooter. Detective Morrison's testimony also corroborated Nelson's testimony at trial.
 {¶ 23} In addition to the above witnesses presented by the State, the prosecutors also called Danyel Fowler ("Ms. Fowler") to testify at trial. Ms. Fowler is the best friend of Ms. Wright, appellant's girlfriend. She testified that she was at appellant's house on the night of the incident. She stated when she arrived there to buy some marijuana from appellant, April and Nelson were also at the house. Ms. Fowler testified that appellant called her a few days after April's murder and asked her to give him a ride out of town. She stated that he told her the police were looking for him in connection with April's murder. Ms. Fowler testified she drove appellant to Pittsburgh, Pennsylvania and dropped him at a Greyhound bus station. She stated he told her his intentions to relocate, find a job, and then send for Ms. Wright and the kids.
 {¶ 24} Ms. Fowler also testified that appellant had an Ohio state identification card in the name of John Hubbard, Jr. that he intended to use. After she dropped him in Pittsburgh, he stated appellant contacted her again. She explained that he left her a voicemail message, requesting that she fax him the birth certificate and social security card of John Hubbard, Jr. Ms. Fowler testified that she looked up the area code of the fax number and discovered it was a Georgia number. She stated she never responded to appellant's phone message. Ms Fowler further testified that, in the year she had known appellant, she had seen him with handguns such as a .357 and a .45.
 {¶ 25} Appellant testified in his defense. The sum and substance of his testimony was that he did not shoot Nelson and April, all the State's witnesses lied because they had been "groomed" by the police, and the Akron police were corrupt, uncooperative with him, and they pinned the crimes on him because he is a black man, a white woman was killed and he has a criminal record dating back to when he was nine years old. Appellant also made a point of stating, time and time again, that he should not have come back and turned himself in to the police and he regrets that decision. This Court recognizes that conflicting testimony was presented by appellant in this case. However, it is well settled that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. This Court refuses to overturn appellant's convictions because the trial court chose to believe the prosecution testimony over his testimony.
 {¶ 26} After thorough review of the record, this Court cannot conclude that the trial court lost its way and created a manifest miscarriage of justice when it convicted appellant of aggravated murder and attempted aggravated murder. Appellant's first and second assignments of error are overruled.
 THIRD ASSIGNMENT OF ERROR
"The trial court erred in imposing consecutive sentences without stating its reasons for so doing."
 {¶ 27} In his third assignment of error, appellant argues the trial court erred in imposing consecutive sentences upon him without stating its reasons for so doing. This Court disagrees.
 {¶ 28} R.C. 2953.08 governs appeals based on felony sentencing guidelines. The statute provides, in relevant part: "A sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06
of the Revised Code is not subject to review under this section." R.C.2953.08(D). As appellant was convicted of aggravated murder, he cannot appeal his sentence. Appellant's third assignment of error is overruled.
 III. {¶ 29} Appellant's three assignments of error are overruled. Accordingly, the judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellant.
Exceptions.
Slaby, P.J. and Batchelder, J., concur.